DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Nationwide Mutual Fire Insurance Co. ) | |
| ) | CASE NO. 5:04 CV 1407 |
| Plaintiff(s), ) | |
| ) | |
| v. ) | <u>MEMORANDUM OPINION</u> |
| ) | <u>AND ORDER</u> |
| General Motors Corporation, et al, ) | |
| ) | |
| Defendant(s). ) | |
| ) | |

Before the Court are three motions for summary judgment filed by the defendants.[1] The motions have been fully briefed and are ripe for determination.

## I. BACKGROUND

This case, removed from the Common Pleas Court of Tuscarawas County, involves an effort by the plaintiff Nationwide Mutual Fire Insurance Co. ("Nationwide") and its insureds, Shirley and Charles Muhs, to obtain a money judgment against three defendants, General Motors Corporation ("GM"),[2] Freightliner Custom Chassis Corporation ("Freightliner") and Newmar Corporation ("Newmar"). The plaintiffs sued the three defendants alleging a fire in a 2002

---

[1] Motion of General Motors Corporation (Doc. No. 28); Motion of Freightliner Custom Chassis Corporation (Doc. No. 31); Motion of Newmar Corporation (Doc. No. 32).

[2] By stipulation dated September 13, 2004, GM was substituted for Allison Transmission.

(5:04 CV 1407)

Newmar Dutch Star Diesel recreational vehicle ("RV"). The fire destroyed both the RV and a 1997 Jeep Wrangler being pulled by the RV.[3]

Nationwide insured the RV and its contents. It seeks to recover from the defendants what it paid the Muhs under the insurance policy. The Jeep was insured only for liability. Therefore, the Muhs seek to recover from the defendants for the loss of the Jeep and its contents.

Newmar manufactured the body, i.e., the coach of the RV. Freightliner manufactured the chassis, which included a transmission manufactured by GM.[4]

The Muhs purchased the RV from a dealer in Florida in March 2002. They were driving it on June 30, 2002 in Connecticut when the fire and resulting destruction of the two vehicles and their contents occurred. The plaintiffs claim that the RV had not needed service and had only 3000 miles on it at the time of the fire.

Nationwide retained an investigator, Richard Morris, who examined the vehicle and determined that the fire began in the transmission of the RV; he was, however, unable to identify a specific defect in the transmission.

---

[3] The Complaint, as amended (Doc. No. 53), alleges negligence, strict product liability, breach of implied warranty and breach of express warranty against all defendants, plus a claim against only defendant Newmar for alleged violation of Florida Statutes Annotated § 320.835.

[4] Apparently, the transmission was actually manufactured by Allison Transmission, a division of GM.

2

(5:04 CV 1407)

Each defendant separately seeks summary judgment, based at least in part on the inability of the plaintiffs to identify a specific defect to support the various causes of action which, in effect, are based on a claim of a defective product.[5]

## II. THE DEFENDANTS' RESPECTIVE ARGUMENTS

Each defendant makes its own arguments. Some of these can be rather quickly addressed and disposed of apart from the more substantive questions raised by this case, namely, the choice of law and product liability questions addressed later in this Memorandum Opinion. (See Sections III and IV, infra).

### A. GM's Arguments

GM manufactured the transmission that was in the RV and allegedly caught fire. GM filed a motion for summary judgment (Doc. No. 28), which it later supplemented (Doc. No. 33). It also filed a reply (Doc. No. 50) to plaintiffs' opposition (Doc. No. 40) to its motion for summary judgment. GM bases its entire argument on plaintiffs' alleged failure to establish any specific defect in the transmission. In GM's view, without a defect, plaintiffs are unable to prevail on any of the claims in their amended complaint.

---

[5] Following the filing of the motions for summary judgment, plaintiffs sought leave to amend the complaint with respect to defendant Newmar. The Court granted that motion, briefly reopened discovery on plaintiffs' claims against Newmar, and permitted supplemental briefing on Newmar's motion for summary judgment. (See Doc. No. 52).

3

(5:04 CV 1407)

GM first challenges the credentials of plaintiffs' expert, Richard E. Morris, who is a fire investigator. In the Court's view, that challenge is untimely and would be better made just prior to or at the trial. The Court will not now attempt to evaluate whether Mr. Morris is a qualified expert under the Federal Rules of Evidence and/or Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 578 (1993).

GM also asserts that Ohio law controls this litigation. The Court rejects that assertion, as discussed below in Section III.

Finally, GM argues that, absent proof by the plaintiff of a defect in the transmission (where the fire started), as the manufacturer of this single component, GM cannot be held liable on any product liability theory under either Ohio or Florida law. The Court concludes that Florida law applies and, under Florida law (as discussed in Section IV), the products liability claims survive GM's motion for summary judgment.[6]

Accordingly, for the reasons discussed in Sections III and IV, infra, GM's motion for summary judgment is denied.

**B.  Freightliner's Arguments**

Freightliner manufactured the chassis for the RV. It did not manufacture the transmission, but it apparently obtained the transmission from GM and installed it in the chassis.

---

[6] As a subset of this argument, in its supplemental memorandum (Doc. No. 33), GM asserts that "[t]he physical facts of the incident are not consistent with a fire caused by a defective transmission." Specifically, GM refers to the fire marshal's finding of a long trail of diesel fuel at the scene, not transmission fluid. This may be a fact for a jury to consider, but it is not dispositive on summary judgment.

(5:04 CV 1407)

Freightliner filed a separate motion for summary judgment (Doc. No. 31) and a reply (Doc. No. 49) to plaintiffs' opposition to that motion (Doc. No. 39).

Freightliner repeats GM's argument that plaintiffs' expert is not qualified. The Court summarily overrules that argument for now. It can be dealt with later.

Freightliner also asserts that, since the fire in the RV occurred in Connecticut, that state's law applies and, under Connecticut law, plaintiffs cannot maintain a product liability action under any theory because they have failed to establish a specific defect in the transmission. As discussed below in Sections III and IV, the Court concludes that Florida law applies and, under Florida law, the products liability claims survive summary judgment.

Finally, Freightliner argues that since there is no dispute that the fire started in the transmission and since Freightliner had nothing to do with manufacturing, supplying or warranting the transmission, there is no theory under which it can be held liable to the plaintiffs; that is, plaintiffs cannot establish that Freightliner had any role in causing the fire which resulted in their damages. Plaintiffs, however, do assert that the chassis which Freightliner supplied consisted of "the motor, transmission, wheels and axles" of the end-product, the RV. (Pl. Mem. in Opp., Doc. No. 39, at 3). Freightliner does not refute this assertion of the plaintiffs or, for that matter, even address it.

Although it does seem clear that Freightliner did not manufacture the transmission, it did at least install it in the chassis of the RV. There is also some evidence in the record to suggest that the fire was caused by leaking transmission fluid due to loose bolts securing the

5

(5:04 CV 1407)

transmission oil pan to the transmission case.  (See Doc. No. 41-10, at 7-8).  Arguably, that is enough for plaintiffs to survive Freightliner's motion for summary judgment.

Accordingly, Freightliner's motion for summary judgment is denied.

## C.  Newmar's Arguments

Newmar manufactured the coach portion of the RV (including the walls, roof and interior).  It obtained the chassis (which included the GM transmission) from Freightliner and it assembled the final product which the Muhs then bought from a dealer in Florida.[7]

Newmar filed a motion for summary judgment (Doc. No. 32), which it later supplemented (Doc. No. 58).  It also filed a reply (Doc. No. 48) to plaintiffs' opposition to the motion (Doc. No. 38), as supplemented (Doc. No. 60).

Newmar makes several arguments in its initial motion.  First, it asserts that plaintiffs' claims are based on failure of a transmission that was not manufactured by Newmar.  Second, it argues that the Newmar Warranty expressly excludes the claims that plaintiffs are making here.  Third, Newmar argues that, applying Florida law, plaintiffs' claims under theories of implied warranty, strict liability and negligence are barred by the "economic loss rule."  Third, Newmar asserts that failure to establish a specific defect in the transmission is a bar to any of the product liability claims brought by the plaintiffs.

After Newmar filed its motion for summary judgment, plaintiffs amended the complaint to add a claim against Newmar under Chapter 320 of the Florida Revised Code.  With respect to

---

[7] The Muhs bought the RV from Independence RV in Winter Garden, Florida.  (Charles Muhs Aff. ¶ 3) (Doc. No. 41-2).

6

(5:04 CV 1407)

this claim, Newmar argues that the particular section of Chapter 320 relied upon by the plaintiffs applies only to RVs being used in Florida as residences <u>and</u> that, in any event, such a claim may only be brought by a buyer.

The Court finds no need to address each of the arguments in Newmar's initial motion for one simple reason: there is absolutely <u>no</u> evidence that Newmar had anything to do with the transmission which plaintiffs alleged caused the fire. Plaintiffs do not specifically address this problem in their memorandum in opposition; rather, they simply assert that, under Florida law (as discussed in Section IV, <u>infra</u>), they are entitled to an inference that the product was defective. That may be so; however, the defendant which plaintiffs' seek to hold liable has to have <u>some</u> connection to the allegedly defective product in order for the inference to apply <u>to that defendant</u>. Unlike Freightliner, which at least had some connection to the allegedly defective transmission, there is <u>no</u> connection between Newmar and the transmission. For this reason alone, Newmar is entitled to summary judgment in its favor on Counts 1 through 4 of the amended complaint.

The fifth claim of the amended complaint is a different matter. Newmar argues that the relevant sections of Chapter 320, Florida Statutes, apply only to motor vehicles that are used as residences in Florida. This does not appear to be so.

Chapter 320 deals generally with motor vehicle licenses. F.S.A. § 320.01(1)(b) defines "motor vehicle" to include "[a] recreational vehicle-type unit primarily designed as temporary living quarters for recreational, camping, or travel use, which either has its own motive power or is mounted on or drawn by another vehicle." The statute identifies eight "basic entities" that

7

(5:04 CV 1407)

qualify as "recreational vehicle-type unit[s]," including the "motor home" which is defined as "a vehicular unit which . . . is a self-propelled motor vehicle, and is primarily designed to provide temporary living quarters for recreational, camping, or travel use." F.S.A.§ 320.01(1)(B)(4). Clearly, there is no requirement that the vehicle be used as any kind of permanent residence, as Newmar suggests.

F.S.A. § 320.835, the specific statute under which plaintiffs assert the fifth claim for relief, provides in relevant part:

> Each manufacturer, dealer, installer, and supplier of mobile homes or recreational vehicles shall warrant each new mobile home or recreational vehicle sold in this state . . . in accordance with the warranty requirements prescribed by this section, for a period of at least 12 months . . . .  The warranty requirements of each manufacturer, dealer, installer, and supplier of mobile homes or recreational vehicles are as follows:
>
> (1)  The manufacturer warrants:
>
> > (a) For a mobile home or recreational vehicle, that all structural elements; plumbing systems; heating, cooling, and fuel-burning systems; electrical systems; fire prevention systems; and any other components or conditions included by the manufacturer are free from substantial defect.

Section 320.822 provides that, in construing §§ 320.822 through 320.862, certain definitions apply, including the following:

> (1) "Buyer" means a person who purchases at retail from a dealer or manufacturer a mobile home or recreational vehicle for his or her own use as a residence, <u>or other related use</u>. (emphasis added)
>
> * * *
>
> (11) "Recreational vehicle manufacturer" means any person, resident or nonresident, who, as a trade or commerce, manufactures or assembles recreational

8

(5:04 CV 1407)

vehicles or van-type vehicles in such manner that they then qualify as recreational vehicles, for sale in this state.

Finally, § 320.838 provides that "[n]otwithstanding the existence of other remedies, a buyer may bring a civil suit for damages against a responsible party who fails to satisfactorily resolve a warranty claim."

It seems clear to the Court that the Muhs are "buyers" who can legitimately bring their claim against Newmar under F.S.A. § 320.835. In the Court's view, however, the fifth clam for relief under this Florida statute cannot be brought by Nationwide, which does not qualify as a "buyer" under the statute.[8]

Therefore, the only claim of the amended complaint that survives Newmar's motion for summary judgment as supplemented is the fifth claim for relief under F.S.A. § 320.835, but only to the extent that the claim is brought by the Muhs.[9]

### III. CHOICE OF LAW

Resolution of the surviving substantive product liability claims in this lawsuit requires the Court to determine which state's law applies.

The plaintiffs now live in Ohio. They purchased the RV in Florida. The fire which resulted in the loss of the RV and the Jeep took place in Connecticut. Plaintiffs claim that the substantive law of Florida should apply because the RV was purchased in Florida. Freightliner

---

[8] The Court expresses no opinion as to any duty on the part of the Muhs, in view of their recovery under Nationwide's insurance policy, to turn over to Nationwide any amount that they might win with respect to this fifth claim for relief.

[9] The Court also notes that a further amendment of the complaint might be required to modify the prayer for the fifth claim. See also, n.8, supra.

9

(5:04 CV 1407)

contends that the law of Connecticut should apply because the fire occurred in Connecticut. In its initial brief, GM seems to imply that the law of Ohio should apply; in its reply brief, GM asserts that since the initial complaint was brought under Ohio law, it would now be prejudicial to switch to Florida law, but that, in any event, even under Florida law it is entitled to summary judgment.

A federal court sitting in diversity must apply the choice-of-law rules of the forum state. Klaxon Co. v. Stentor Elec. Manufacturing Co., 313 U.S. 487, 496 (1941); Tele-Save Merch. Co. v. Consumers Distrib. Co., 814 F.2d 1120, 1122 (6th Cir. 1987). Therefore, this Court must apply Ohio's choice-of-law rules.

In tort cases, although Ohio law traditionally relied upon the location where the tort occurred in determining which law to apply, in Morgan v. Biro Manufacturing Co., Inc., 15 Ohio St.3d 339 (1984) (per curiam), the Ohio Supreme Court held that, when there is a choice of law question, Ohio courts should look to the balancing test set forth in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS, beginning with § 146, in making the determination. The court stated:

> . . . Pursuant to this section [§ 146], a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit. To determine the state with the most significant relationship, a court must then proceed to consider the general principles set forth in Section 145. [footnote omitted]. The factors within this section are: (1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 [of the RESTATEMENT] which the court may deem relevant to the litigation. All of these factors are to be evaluated according to their relative importance to the case.

10

(5:04 CV 1407)

15 Ohio St.3d at 342 (footnote omitted).[10]

Therefore, this Court should apply the law of the state which has the most significant interest with regard to the claims. This is a product liability action founded on theories of strict liability, negligence, and breach of implied and express warranties. "In product liability claims, the primary interest of a state is to deter the sale and/or manufacture of negligently or defectively manufactured goods to that state's citizens." Cheatham v. Thurston Motor Lines, 654 F.Supp. 211, 214 (S.D. Ohio 1986). "Because the central event upon which a products liability claim is normally based is the sale of the goods, injured parties would expect that the law of the place of sale should govern with respect to injuries caused by those defects." Id.

Here, the sale occurred in Florida. As to this particular sale, Florida has an interest far superior to that of either Ohio or Connecticut. Therefore, under conflict-of-law rules, Florida law should apply to the product liability claims in Counts One through Four. Under Florida law,

> [w]hile appellants are not required to prove in a strict liability action that the manufacturer or retailer was negligent in the preparation or distribution of a

---

[10] The RESTATEMENT (SECOND) OF CONFLICT OF LAWS, § 6 provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
    (a) the needs of the interstate and international systems,
    (b) the relevant policies of the forum,
    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
    (d) the protection of justified expectations,
    (e) the basic policies underlying the particular field of law,
    (f) certainty, predictability and uniformity of result, and
    (g) ease in the determination and application of the law to be applied.

11

(5:04 CV 1407)

> product, they nevertheless have the burden, whether their case is founded in negligence, breach of an implied warranty, or strict liability, of establishing (1) that a defect was present in the product; (2) that it caused the injuries complained of; and (3) that it existed at the time the retailer or supplier parted possession with the product. 2 Frumer and Friedman, PRODUCTS LIABILITY, § 16A(4)(e)(i) at 3B-88, 89 (1980).

Cassisi v. Maytag Co., 396 So.2d 1140, 1143 (Fla. App. 1981).[11] This is the law that must be applied herein.

## IV. APPLICATION OF FLORIDA LAW IN THIS CASE

Defendants all argue that, although plaintiffs' investigator pinpointed the transmission of the RV as the source of the fire, he was unable to identify any defect in the transmission that proximately caused the fire.[12] They argue that there is no evidence that the transmission or any of its components failed and resulted in the fire.

Plaintiffs argue that the fact that their investigator is unable to specify the defect in the transmission does not defeat their claim because there is no factual dispute as to the location of the fire, i.e. the transmission supplied by GM. Plaintiffs rely on Florida case law that provides for a legal inference of a defect when a product malfunctions during normal operation. That case law provides:

---

[11] Under Ohio law, a plaintiff must prove the same three elements: (1) that there was a defect in the product, (2) that the defect existed at the time the product left the manufacturer's hands; and (3) that the defect was the direct cause of the plaintiff's injuries. State Farm Fire & Cas. Co. v. Chrysler Corp., 37 Ohio St.3d 1, 5 (1988).

[12] Defendants also claim that plaintiffs' expert, Richard E. Morris, does not qualify as an expert. That determination will be saved for another day.

12

(5:04 CV 1407)

> [u]nder Florida law, the first prong [of the three-pronged product liability test] may be met through the application of an inference of defect, which is allowed in certain circumstances. [Cassisi, 396 So.2d] at 1140-53. More specifically, in Cassisi, the Florida courts adopted the rule in Greco v. Bucciconi Engineering Co., 283 F.Supp. 978 (W.D.Pa. 1967), which simply states that when a product malfunctions during normal operation, a legal inference (of defect) . . . arises, and the injured plaintiff thereby establishes a prima facie case for jury consideration." Cassisi, 396 So.2d. at 1148. Thus, to obtain the benefit of a legal inference of defect, a plaintiff may provide circumstantial evidence that a "malfunction" occurred during "normal operation." Id. Such an inference then establishes a prima facie case of defect for jury consideration. (footnote omitted). Moreover, under Florida law, once a plaintiff establishes "malfunction" and "normal operation," a plaintiff is not required to negate alternate grounds of causation. Id. at 1149-50. (footnote omitted). To prevent the issue from going to the jury, a defendant manufacturer effectively "must offer evidence showing there are no genuine issues of material fact to be resolved by a jury -- rather than suggest alternative explanations of the malfunction." Zyferman v. Taylor, 444 So.2d 1088, 1092 (Fla.Dist.Ct.App.1984) (citing Cassisi, 396 So.2d at 1151).

Kaplan v. Daimlerchrysler A.G., No. 02-13223, 2003 WL 22023315, at * 2 (11th Cir. Aug. 1, 2003).

GM analyzes Cassisi v. Maytag, 396 So. 2d 140 (Fla. App. 1981), and argues that Cassisi only applies where there is a malfunction of the product. GM argues that the Cassisi-Greco inference of a defect in the product does not apply in this case because, although there is evidence that the transmission caught on fire, there is no evidence that it malfunctioned.

GM relies on Humphreys v. General Motors, 839 F. Supp. 822 (N.D. Fla. 1993), in which the plaintiff sought money damages on the theory that the driver's seat back locking device malfunctioned during an automobile accident and contributed to the plaintiff's injuries. However, the plaintiff's car and the component parts were destroyed and the plaintiff had no affirmative evidence to support the claim of a defect. The Humphreys court rejected the plaintiff's reliance on the Cassisi-Greco inference of a defect in the following discussion:

13

(5:04 CV 1407)

> Florida courts have applied the Cassissi [sic] inference in a variety of products liability cases. See e.g., Jones v. Heil Co., 566 So.2d 565, 567 (Fla. 1st Dist.Ct.App.1990) (defective garbage truck); Thrasher v. Koehring Co., 543 So.2d 754 (Fla.3d Dist.Ct.App.1988) (defective construction crane); Marcus v. Anderson/Gore Homes, Inc., 498 So.2d 1051, 1052 (Fla. 4th Dist.Ct.App.1986) (defective household hot water heater); Gencorp, Inc. v. Wolfe, 481 So.2d 109, 111 (Fla. 1st Dist.Ct.App.1985) (defective truck tire). While it is tempting to generalize about the types of products and malfunctions this inference applies to, the Court does not feel it is necessary to do so in this case. As the Cassissi court made clear, there are only two essential predicate facts for the inference to apply: (1) a malfunction (2) during normal operation. Cassissi, 396 So.2d at 1151.
>
> Here, the record indicates neither of these facts exists. As explained above, Plaintiffs have presented no evidence of any defect in the car's seat back locking device. While the seat back may have broken during the accident, this does not automatically mean the seat "malfunctioned." To establish that the seat back malfunctioned, Plaintiffs must present evidence -- most likely through expert testimony -- that it did not perform properly under the circumstances. As noted earlier, Plaintiffs have not submitted any affidavits or written reports supporting the conclusion the seat back was defective or malfunctioned.
>
> Meanwhile, this case does not involve the "normal use" of a 1985 Cavalier station wagon. The seat back device allegedly malfunctioned as the result of a rear-end collision involving four cars. This is hardly the "normal use" of an automobile. While the Court agrees that certain automobile components like seat belts are designed and intended to prevent injury during an accident, it still cannot be said that being rear-ended at an intersection is a normal, recurring event while driving. Rather, a collision subjects the car and its safety devices to abnormal and uncertain stresses. Whether a component failed under these circumstances is not obvious as was the case with the clothes dryer at issue in Cassissi.
>
> Thus, the Court concludes the Cassissi inference does not apply here. Accordingly, the Court finds Defendant has carried its burden of showing the record reveals no genuine issue of material fact as to Plaintiffs' claim under strict liability. Plaintiffs have failed to present any evidence (1) of a defect, (2) that the car reached them without substantial change, and (3) causation of injuries. Defendant is entitled to judgment as a matter of law on the claim brought under strict liability.

Humphreys, 839 F.Supp at 828-29 (misspelling of "Cassisi" as "Cassissi" in original, passim).

(5:04 CV 1407)

This Court conducted the Case Management Conference in this case on September 9, 2004.  The Court was advised that the destruction of the vehicles was the result of a fire in the transmission in the RV.  It became apparent at the conference that the plaintiffs were unable to pinpoint the reason for the fire in the transmission and the Court questioned whether the plaintiffs were entitled to rely on the principles that underlie a *res ipsa loquitor* case.  The Cassisi opinion addressed the *res ipsa loquitor* inference and held that the Greco inference was somewhat analogous to *res ipsa*.  It opined as follows:

> The Greco inference is somewhat analogous to the *res ipsa loquitur* inference application to negligence cases.  While, as Prosser states, "[s]trictly speaking, since proof of negligence is not an issue, *res ipsa loquitur* has no application to strict liability; . . . the inferences which are the core of the doctrine remain, and are no less applicable."  Prosser, LAW OF TORTS, § 108 at 672-73 (4th ed. 1971).  Both legal inferences are similar since they are based upon common sense assumptions that the occurrence of the accident is such that in the ordinary course of events it could not have happened -- as to *res ipsa*, without the negligence of the person in control, Goodyear Tire & Rubber v. Hughes Supply, Inc., 358 So.2d 1339, 1341 (Fla.1978), and as to the other, without the product's defective condition.  Additionally, both inferences are founded upon strong policy considerations that aid a plaintiff in meeting his burden of proof when direct proof of negligence or product defectiveness is wanting.  Indeed, the case giving birth to the doctrine of *res ipsa*, Byrne v. Boadle, 2 H & C 722, 159 Eng.Rep. 299 (Ex.1863), was heavily influenced by the plaintiff's inability to extract an explanation from the defendant, as well as his incapacity to explain how the barrel which injured him fell from the second floor of Boadle's warehouse.  Later cases applying the *res ipsa* doctrine have done so when the evidence of the true explanation of the accident is more accessible to the defendant than to the plaintiff.  See Hughes v. Jolliffe, 50 Wash.1d 554, 313 P.2d 678 (1957); Appalachian Insurance Co. v. Knutson, 358 F.2d 679 (8th Cir. 1966); Wilson v. East St. Louis & Interurban Water Co., 295 Ill.App. 603 15 N.E.2d 599 (1938).
>
> The application of the Greco inference as an aid to a plaintiff's establishing a prima facie case is perhaps most vividly portrayed by those cases in which the product was so badly damaged by a malfunction as to render impossible the plaintiff's ability to point with specificity the exact one of several potentially dangerous conditions which caused the accident.

15

(5:04 CV 1407)

Cassisi, 396 So.2d at 1149.

In the Court's view, where, as here, the transmission fire takes place in a new vehicle that had been driven only approximately 3000 miles, leaving the transmission in a condition that defies any attempt to determine the cause of the fire, use of the Cassisi-Greco inference is justified. Stated in other terms, does the mere fact of a fire in a virtually new transmission support a finding that there was a *malfunction* in the transmission which, in turn, evidences a *defect*? In the Court's view, the answer to the question is dispositive and is a matter for a jury.

## V. CONCLUSION

GM's motion for summary judgment (Doc. No. 28) and Freightliner's motion for summary judgment (Doc. No. 31) are both denied. Newmar's motion for summary judgment (Doc. No. 32) is granted as to the first through fourth claims for relief and denied as to the fifth claim for relief.

IT IS SO ORDERED.

| | |
|---|---|
| February 13, 2006 | */s/ David D. Dowd, Jr.* |
| Date | David D. Dowd, Jr. |
| | U.S. District Judge |